Terry T. PENN, Plaintiff–Appellant,

v.

HOWE–BAKER ENGINEERS, INC., et al., Defendants–Appellees.

No. 89–2257.

United States Court of Appeals, Fifth Circuit.

April 26, 1990.

---

Robert M. Bandy and Charles E. Head, Bandy, Head & Raney, Tyler, Tex., for plaintiff-appellant.

R. Michael Moore, Fulbright & Jaworski, Houston, Tex., for defendants-appellees.

Before GARZA, WILLIAMS and DAVIS, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

Appellant, Terry T. Penn, claims certain benefits under the Howe–Baker Engineers, Inc. pension plan. The Howe–Baker Pension Committee denied him the benefits, determining that he did not meet the requirements for vesting accrued benefits under the plan. The district court upheld the Pension Committee's decision. We affirm.

I.

From June 23, 1975 through October 24, 1984, Terry Penn was continuously employed by Howe–Baker.[1] For some time in 1985, he was again affiliated with Howe–Baker. At the time Penn was hired, Howe–Baker maintained a pre-ERISA pension plan, entitled the Howe–Baker Engineers Pension Plan ("Plan"). The Plan became effective on August 31, 1974 and underwent a series of amendments before it was terminated in 1985.

Three amendments are pertinent to Penn's case. In June 1976, the Plan was first amended and restated, effective January 1, 1975, to comply with ERISA. In January 1977, the Plan was amended to comply with the IRS Code. That amendment, called the "First Amendment to the Plan," although actually it was the second, also became effective retroactively on January 1, 1975. The Third Amendment to the Plan, executed February 1984 and effective January 1, 1984, changed the fiscal year of the Plan to a calendar year, adopting a short fiscal year from October 1, 1983 through December 31, 1983. It also changed the method of calculating vested service from a "1,000 hours" to an "elapsed time" method.[2]

Effective March 2, 1985, the Plan was terminated. In compliance with the IRS, all employees laid off during 1984, as well as all employees of Howe–Baker as of March 2, 1985, were fully vested in their accrued benefits under the Plan. Employ-ees who had voluntarily terminated their employment in 1984 were not fully vested.

The conditions that surrounded both Penn's leaving Howe–Baker in October 1984 and his work for Howe–Baker in 1985 are highly disputed. The trial court found, and both parties agree, that Penn took a leave of absence from Howe–Baker for sixty days in August 1984. At the end of that sixty day period, his job with Howe–Baker was terminated. Penn claims that the job was terminated for lack of work. Howe–Baker claims that Penn decided to quit due to a ten percent reduction in pay and that the company gave Penn sixty days to reconsider his decision. At the end of the sixty days, Penn had not contacted anyone at the company so his employment was terminated.

In 1985, Penn did a substantial amount of work for Howe–Baker. Penn contends he was "recalled" at that time and that the work he did was essentially the same as the work he had done before his termination. He claims he had the same work location, the same desk, and the same supervisors he had previously. Howe–Baker argues that Penn was an independent contractor during this time and that he was unable to work as a full-time regular employee because he already was working full-time elsewhere. When Penn returned to do some work for Howe–Baker, he and Howe–Baker signed a Design Services Agreement designating Penn as an independent contractor. When he commenced his services, he was not required to take a physical examination and he was given none of the benefits of regular employees. Moreover, he was paid in full for time he worked, without income tax withholding or other deductions. He reported his income during that time as profit from a sole proprietorship.

In May 1986, Penn requested the payment of his accrued benefits under the Plan. The next day Howe–Baker notified

---

1. Penn was originally employed as a structural draftsman. By 1984, the date at which he ended continuous employment, he had advanced to Senior Structural Designer.

2. The "1,000 hour method" gives an employee one year of vesting credit for any year she or he works one thousand hours. The "elapsed time method" calculates vesting credit by counting the actual time between the employee's starting and termination dates.

him that he had forfeited his rights under the Plan. After a hearing, the Pension Committee of the Plan Administrator upheld the initial decision to deny benefits.

Penn then filed this suit in federal district court, seeking recovery of the benefits denied him by the Committee. After trial without a jury, the district court entered Findings of Fact and Conclusions of Law and directed judgment for Howe–Baker.

Penn appeals the district court's decision upholding the Committee's denial of benefits. He argues that he is entitled to the benefits on four different grounds: (1) He was laid off in 1984; (2) He was an employee of Howe–Baker at the time of the Plan's termination in March 1985; (3) Under proper methods of calculating years of service for vesting purposes, he is entitled to ten years of service and is therefore 100% vested in the Plan; and (4) In accordance with an IRS General Counsel Memorandum dealing with breaks in service, he is fully vested in his accrued benefits. We shall consider each of these contentions in turn. But first we must resolve significant questions on the standard of judicial review by the District Court and by this Court of the decision of the Pension Committee.

## II.

■ The Supreme Court handed down a recent decision in *Firestone Tire and Rubber Company v. Bruch*, — U.S. ——, 109 S.Ct. 948, 957, 103 L.Ed.2d 80 (1989), which alters a number of prior court decisions applying an arbitrary or capricious standard of review to pension committees' conclusions. In *Firestone*, the Supreme Court held that "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," courts should review challenges of denial of benefits *de novo*. *Firestone*, 109 S.Ct. at 956. Because the Howe–Baker plan does give the Committee authority to determine benefit eligibility, it falls within the exception in *Firestone*. The fact that the Howe–Baker plan meets this exception, however, does not mean that Penn's case is unaffected by *Firestone*.

Prior to *Firestone*, the Fifth Circuit had followed a limited scope of review for denial of benefits under ERISA. Along with other courts, we considered ourselves bound by a committee's interpretation and determinations unless they were arbitrary or capricious. *See, e.g., Dennard v. Richards Group, Inc.*, 681 F.2d 306, 313 (5th Cir.1982); *Bayles v. Central States, Southeast & Southwest Areas Pension Fund*, 602 F.2d 97, 99–100 (5th Cir.1979). A number of courts, however, recognized that such a broad deferential review could not be accorded questions of law under ERISA. Nearly all courts properly acknowledged that questions of law should receive at least some less deference than questions of fact or plan interpretations. *See e.g., Holt v. Winpisinger*, 811 F.2d 1532, 1536 & n. 29 (D.C.Cir.1987). But before *Firestone*, a number of Circuit Courts had developed an "erroneous standard" for evaluating questions of law under ERISA. This standard apparently originated with the arbitrary or capricious standard in the D.C. Circuit's opinion in *Danti v. Lewis*, 312 F.2d 345 (D.C.Cir.1962). *Dennard*, 681 F.2d at 314 (citing *Wardle v. Central States, Southeast & Southwest Areas Pension Fund*, 627 F.2d 820, 823 (7th Cir.1980), *cert. denied*, 449 U.S. 1112, 101 S.Ct. 922, 66 L.Ed.2d 841 (1981)). In *Danti*, the Court explained that the question to be asked on review is "whether the Trustees have acted arbitrarily, capriciously or in bad faith; that is, is the decision of the Trustees supported by substantial evidence or *have they made an erroneous decision on a question of law.*" *Danti*, 312 F.2d at 348 (emphasis added).

Although several courts claimed to follow an "erroneous" standard when reviewing questions of law under ERISA, none specifically articulated the meaning of that ambiguous standard. In some cases, the courts seemed to apply, in essence, a *de novo* standard. *See, e.g., Holt*, 811 F.2d at 1538–41; *Richardson v. Central States, Southeast & Southwest Areas Pension Fund*, 645 F.2d 660, 662–63 (8th Cir.1981). Other courts, however, continued to give great deference to the pension committee's determinations regarding questions of law, practically applying an arbitrary or capricious standard. *See, e.g., Carter v. Central States, Southeast & Southwest Areas Pension Plan*, 656 F.2d 575, 577–78 (10th Cir.1981); *Wardle*, 627 F.2d at 824–28 (holding that the pension committee's decision regarding a question of law was not arbitrary or capricious or erroneous as a matter of law). Both the *Carter* and *Wardle* courts pointed out that even though they might have decided the issue differently, were they the original triers, the standard of review required that they be more deferential to decisions by the pension trustees. *See Carter*, 656 F.2d at 578; *Wardle*, 627 F.2d at 827.

In *Firestone,* however, the Supreme Court discussed in detail the emergence and history of the arbitrary or capricious standard as applied to ERISA cases. It pointed out that prior to ERISA, disputes involving denial of benefits under a pension plan were governed by contract law principles. Courts have long applied a *de novo* standard of review in interpreting contracts. *Firestone,* 109 S.Ct. at 955. Because "ERISA was enacted 'to promote the interests of employees and their beneficiaries in employee benefit plans,'" *id.* at 955 (quoting *Shaw v. Delta Airlines, Inc.,* 463 U.S. 85, 90, 103 S.Ct. 2890, 2896, 77 L.Ed.2d 490 (1983)), the Court pointed out that it would contravene those purposes to impose a standard of review that afforded less protection to employees than they had prior to ERISA. Accordingly, *"wholesale* importation of the arbitrary and capricious standard into ERISA is unwarranted." *Id.* at 953 (emphasis in original).

■ Because the Howe–Baker plan falls under the *Firestone* exception, we continue to apply the arbitrary or capricious standard to the Committee's interpretations of the Plan—the contract—and any fact findings the Committee made. As long as the interpretations or fact findings are not arbitrary or capricious, we do not upset them.[2A] The Committee's authority to make such determinations is granted by the terms of the Plan itself. However, in contrast to the great deference we grant the Committee's interpretations of the Plan, which involve contract interpretation, we accord no deference to the Committee's conclusions as to the controlling law, which

involve statutory interpretation. The interpretation of ERISA itself must be made *de novo* by the court.[3] Such is the impact of *Firestone.*

### III.

■ Penn first claims he is entitled to accrued benefits under the Plan because he was laid off in 1984. According to the Plan's termination, all employees laid off in 1984 were fully vested in their accrued benefits. The Committee determined that Penn was not laid off but voluntarily quit and therefore denied him benefits. The district court agreed. Penn argues that the evidence was insufficient to support the Committee's finding. We disagree.

After a trial, the district court found that in August 1984, Penn approached a Howe–Baker official and informed him that he would not accept a proposed ten percent reduction in pay. That same month, Penn arranged to work for another company. Penn informed his immediate supervisor that he was quitting. In order to retain Penn, the company agreed to give him the sixty day leave of absence. Since Penn never attempted to return to work during that time, his employment was terminated at the end of the sixty days. The Payroll Change Notice in Penn's personnel file indicated that Penn left because of reduced salary levels, was given a sixty day leave of absence, and was then released. The box marked "left" was checked, rather than the box marked "discharged" or "laid off."

Penn maintains that he was laid off and argues that the evidence was insufficient

---

**2A.** The district court decided this case under an arbitrary or capricious standard before the Supreme Court handed down *Firestone.* We use the arbitrary or capricious language in our opinion because it is the language used by the district court.

We have read Firestone to require the application of an abuse of discretion standard to the review of plan interpretations made by administrators granted discretionary authority by their plans. See *Lowry v. Bankers Life and Casualty Retirement Plan,* 871 F.2d 522, 525 (5th Cir. 1989); *Batchelor v. Int'l Brotherhood of Electrical Workers Local 861,* 877 F.2d 441, 442 (5th Cir.1989). We also have recognized, though, that the way to review a decision for abuse of discretion is to determine whether the plan committee acted arbitrarily or capriciously. See *Batchelor,* 877 F.2d at 444–48 (applying a process of review that first determines the legally correct interpretation of the plan and then determines whether the plan administrators act-

ed arbitrarily or capriciously in light of that interpretation). Hence, when we were asked to rehear Lowry, in light of Firestone, we declined to do so. Instead, we determined that the analysis of our earlier opinion made clear that the plan administrators had not abused their discretion. *Lowry,* 871 F.2d at 525. We refused to draw a distinction between the two standards and determined that it would be useless to reconsider the case for abuse of discretion since "[i]n either instance the result in [the] case would be identical." Id.

**3.** We are accustomed to giving some deference to governmental agency interpretations of their organic statutes. This case is widely different because it involves whether deference should be given to private parties—a pension committee— in interpretation of a statute. We do not give the right to interpret statutes to private citizens. We of course grant deference to the Committee's factual determinations that are necessary to the review of law questions.

to support a finding that he voluntarily left. Penn bases his own argument on a letter he received on October 24, 1984 (the date the sixty days expired), an office memorandum prepared immediately preceding his leave of absence, and the Payroll Change Notice. All three of the documents use the word "terminate." Additionally, Penn relies on the testimony of former fellow employees who claimed they believed Penn had been laid off or terminated for lack of work.

After careful review of the record, we find sufficient evidence to support the finding that Penn left due to a reduction in salary and was not laid off. While Penn points to evidence that indicates some possible ambiguity about his termination, he offers no evidence showing convincingly that he was laid off or involuntarily terminated. The word "terminate" is ambiguous. No question but that Penn's employment was ended (i.e. terminated) sixty days after he was placed on leave. But the question is why it was terminated. The answer in the evidence is that Penn voluntarily let the sixty day leave expire because he chose to leave his employment.[4]

The district court thoroughly considered this issue and determined that the Committee's finding that Penn voluntarily left Howe–Baker was substantially supported by evidence before the Committee and was not arbitrary or capricious. Given our review of the record, particularly of the Payroll Change Notice and trial testimony, we must agree. Sufficient evidence exists to support the Committee's determination.

## IV.

Penn next claims he is due benefits under the Plan because on March 2, 1985 he was an employee of Howe–Baker, under the common law definition of "employee", as opposed to and "independent contractor." According to the Plan's termination, all employees of Howe–Baker on that date were fully vested in their accrued benefits. The Committee determined, however, that Penn was an independent contractor, not an employee, at the pertinent time and therefore could not claim the vesting of benefits. The district court made findings of fact and, based upon those findings, concluded that "[t]he Committee's determination that Penn was an independent contractor when the Plan terminated in 1985 is supported by substantial evidence and is not arbitrary and capricious." By applying the arbitrary or capricious standard to this determination by the Committee, the district court erred because the issue of employee or independent contractor is a statutory issue. We do not reverse, however, because after reviewing the issue *de novo*, we conclude that Penn was an independent contractor at the time of the Plan's termination.

We emphasize that whether an individual is an employee or an independent contractor is a question of law involving the interpretation of ERISA. *Holt*, 811 F.2d at 1536; *Short v. Central States, Southeast & Southwest Areas Pension Fund*, 729 F.2d 567, 571 (8th Cir.1984).[5] Accordingly, we review it *de novo*. We do so by applying the common law of agency to the

---

4. Both the author of the letter and of the memorandum and payroll change testified that "terminate" did not necessarily mean that the cessation of the relationship was involuntary. That the payroll change marked "left" as opposed to "discharged" or "laid off" supports that testimony. Moreover, evidence was entered to show that the letter Penn received was substantially different from letters received by those employees who were laid off.

5. Although this case provides the first opportunity for this Circuit to address the issue of whether an individual is an employee or an independent contractor in the ERISA context, we agree with the D.C. and Eighth Circuits that

the issue involves a question of law. In reviewing the same type of decisions under the Fair Labor Standards Act, we have determined that the question is one of law. *See, e.g., Beliz v. W. H. McLeod & Sons Packing Co.*, 765 F.2d 1317, 1327 (5th Cir.1985); *Castillo v. Givens*, 704 F.2d 181, 185 (5th Cir.1983), *cert. denied*, 464 U.S. 850, 104 S.Ct. 160, 78 L.Ed.2d 147 (1983). Since the ERISA definition of employee is identical to the FLSA definition, *Wheeler v. Hurdman*, 825 F.2d 257, 268 n. 22 (10th Cir.1987), *cert. denied*, 484 U.S. 986, 108 S.Ct. 503, 98 L.Ed.2d 501 (1987), there is no basis for treating the issue in the ERISA context as a question of fact.

record.[6]

Reaching a legal conclusion as to whether Penn was an employee or an independent contractor requires examining and weighing a number of factors. As the Supreme Court recognized over twenty years ago,

> there is no shorthand formula or magic phrase that can be applied to find the answer, but all of the incidents of the relationship must be assessed and weighed with no one factor being decisive. What is important is that the total factual context is assessed in light of the pertinent common-law agency principles.

*NLRB v. United Insurance Company of America*, 390 U.S. 254, 258, 88 S.Ct. 988, 991, 19 L.Ed.2d 1083 (1968). In this case, Penn and Howe–Baker agree that *Holt* correctly outlines the factors to be applied in determining whether an individual is an employee or an independent contractor. *See Holt*, 811 F.2d at 1540–41 and nn. 54–61. The *Holt* court put special emphasis on the issue of control, determining that "the right of one party to control not only the result to be achieved by the other, but also the means and manner of performing the task assigned, is the most critical factor

in ascertaining whether an employment relationship exists." *Holt*, 811 F.2d at 1539.

*In Community For Creative Non–Violence v. Reid,* — U.S. —, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989), the Supreme Court offered an expansive list of criteria for determining whether a person being paid for work is an employee. The Court first noted the need to consider the employer's right to control the manner and means by which the work product is accomplished. Then the Court listed the following factors as also relevant:

> the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

---

**6.** The Fourth Circuit has taken a mostly statutory, rather than common law, approach to analyzing whether an individual is an employee or an independent contractor. *See Darden v. Nationwide Mut. Ins. Co.,* 796 F.2d 701, 706 (4th Cir.1986). The Fourth Circuit recognized that the ERISA statute offers little guidance in providing a definition of employee. But the Court, in formulating its definition, turned to what it considered Congress' broader goals in enacting ERISA. *Id.* at 706–07. Other Circuits, however, have continued to apply common law principles, based on the little guidance Congress offered. As the D.C. Circuit explained in *Holt:*

> The absence of a comprehensive definition of "employee" in ERISA and other features of that legislation indicate plainly enough that Congress intended the Secretary of the Treasury and the Secretary of the Labor, who were administrators of various ERISA provisions, to continue their practice of defining "employee" in terms of commonlaw agency principles.

*Holt,* 811 F.2d at 1538, n. 44. *See also Wolcott v. Nationwide Mut. Ins. Co.,* 884 F.2d 245, 250–51 (6th Cir.1989) (concurring in the *Holt* court's position that common law rules of agency ought to be applied under ERISA). The Seventh and

Eighth Circuits also have applied the common law of agency in determining whether one is an employee under ERISA. *See Wardle,* 627 F.2d at 824–25; *Short,* 729 F.2d at 572–73. We agree that because Congress provided no specific statutory definition of "employee" under ERISA we properly apply the common law of agency.

Some courts have turned to state agency law for these purposes. *See, e.g., Short,* 729 F.2d at 572. We, however, only look to the federal rule of agency because of the vast preemptive nature of ERISA. In doing so, we are aided by the Supreme Court, which has followed federal agency law in determining whether a worker was an employee or an independent contractor under the federal copyright statute:

> Establishment of a federal rule of agency, rather than reliance on state agency law, is particularly appropriate here given the Act's express objective of creating national uniform copyright law by broadly pre-empting state statutory and common-law copyright regulations. See 17 U.S.C. 301(a). We thus agree with the Court of Appeals that the term "employee" should be understood in light of the general common law of agency.

*Community for Creative Non–Violence v. Reid, infra,* 109 S.Ct. at 2173. Similar strong emphasis upon uniformity is found in ERISA.

*Community for Creative Non-Violence,* 109 S.Ct. at 2178–79 (citations omitted). This list generally mirrors the Restatement of Agency 220(2), which *Holt* also followed.

We are only concerned about Penn's status on March 2, 1985, the date the Plan was terminated. Our review of the record indicates that at that time Penn was largely in control of the means by which he performed the tasks he was assigned. Although Penn physically worked at Howe–Baker and used tools provided by Howe–Baker, he set his own schedule for performing the assigned work.

The record shows that Penn first returned to work for Howe–Baker during the week ending January 19, 1985. During his first five weeks of work his hours appear irregular as he logged between six and sixteen hours a week. During the latter two weeks prior to March 2, Penn logged thirty hours each week. Still, the hours were irregular and apparently largely unsupervised. Nine of the hours, for example, were worked on a Saturday. On March 2, Penn still was not working full time and still set his own hours. Indeed, he only logged five hours for that day.

Penn's hours were irregular during these months in part because he was working for another company at the same time. At oral argument, Penn's counsel emphasized that as soon as Penn's contract ended with the other company, he came back to Howe–Baker full time. He conceded, however, that there was an overlap of jobs in January, February, and March.[7] We are only

concerned, though, with Penn's status on March 2. That Penn may have begun working full-time after that date does not affect his lack of eligibility for vesting of accrued benefits.

In addition to controlling his own hours, the district court found, and the record bears out, that Penn received little supervision from Howe–Baker. One critical fact is that, to the extent he was supervised, he was supervised by Robert Fuller, who was not even an employee of Howe–Baker but who had a contract with Howe–Baker for a particular project.[8]

Finally, the intent of the parties to enter into an independent contractor status is clear.[9] Penn never suggests that he was coerced into signing the Design Services Agreement or that the agreement was a sham. Penn was paid as an independent contractor, and he filed his IRS forms as an independent contractor.

While evidence exists to support factors that would weigh on the employee side of the scale, those factors do not under ERISA tip those scales. We therefore hold that as a matter of law, Penn was an independent contractor on March 2, 1985.

## V.

Next Penn argues that even if benefits did not vest as a result of being laid off in 1984 or of being an employee at the time of the Plan's termination, he is still entitled to benefits because he had ten years of vested service in the Plan. Two ways of calculat-

---

7. Penn testified at trial that he went back to a full-time status during the first or second week in March, but could not recall the actual date.

8. Fuller testified at trial that he also had been Penn's supervisor in 1984. At that time, Fuller too was an employee of Howe–Baker. Penn insists he had the same job in 1985 as the one he had in 1984, including the fact that he was supervised by the same people. Fuller's testimony corroborated that position by testifying that Penn's job in 1985 was "basically the same" as his job prior to leaving Howe–Baker. Fuller also testified, though, that Fuller's job too was basically the same as the one he had before. Nevertheless, Fuller's status in 1985 was clear: he was an employee of another company who supplied him to Howe–Baker under a contract. The mere fact, then, that the critical tasks of

Penn's job might have been similar in this context does not mean that Penn was an employee.

9. While we recognize that the intent of the parties is "merely one of a number of factors[ ] that the common law weighs in distinguishing an employee from an independent contractor," *Holt*, 811 F.2d at 1538–39 (citing *Ward v. Atlantic Coast Line R. Co.*, 362 U.S. 396, 400, 80 S.Ct. 789, 792, 4 L.Ed.2d 820 (1960); *In re Shulman Transport Enterprises, Inc.*, 744 F.2d 293, 295 (2d Cir.1984)), it is nevertheless a significant factor. In this case, the Design Services Agreement sheds light on a number of other factors, such as "method of payment," "provision of employee benefits," and "tax treatment of the hired party." *Community for Creative Non-Violence,* 109 S.Ct. at 2179.

ing Penn's vested service are proper: the "1,000 hour method," which was in effect prior to the Third Amendment to the Plan, and the "elapsed time method," which was in effect after the Third Amendment. Because at the time of the amendment, Penn had five years of service in the Plan, he could elect either method, depending on which one would result in the greatest amount of time. Penn claims that under the 1,000 hour method, he is entitled to the requisite ten year period of service. The Committee found, however, and the trial court upheld the finding that under either method Penn did not accrue ten years of service.[10]

■ The critical period to resolve this dispute is from June 23, 1975, Penn's starting date, through December 31, 1975. Penn claims he is entitled to one year of service working during that period. He bases his argument on Section 4.01B of the amended and restated Plan, which stated that "[a]ny member who completes 1000 hours of employment during the period commencing January 1, 1975 and ending December 31, 1975, shall receive credit for (1) year of service for purposes of determining vesting under this Section 4.01B." Accordingly, Penn calculates ten years of service by counting one year for the 1000 hours he worked from June through December 1975 and then counting an additional nine years, beginning with the fiscal year from October 1975 through September 1976. His calculation is supportable only by counting twice some of the work he did in 1975.

The difficulty with Penn's claim is that the IRS–required First Amendment to the Plan deleted the 4.01B language. The Amendment was executed to take retroactive effect on January 1, 1975, the same date the amended and restated Plan became retroactively effective. But Penn argues that the Plan could not be amended retroactively to delete the vesting provision that applied to him. He bases his argument on Department of Labor Regulation 2530.203–2(c), which prohibits a change in vesting computation from depriving an employee of his or her *vested percentage* of accrued benefit prior to the change.

We find that the Committee's interpretation of the Plan in its calculation of years of service is not arbitrary or capricious. First, the district court specifically found that the Committee relied on the opinions of Howe–Baker's accountants, actuaries, and attorneys in calculating years of service. Hence, the calculations were supported by substantial evidence.

Second, when Penn first became eligible, the Plan operated on a strict fiscal year. Under that scheme he was not entitled to ten years of service. Hence, the only way he can derive the ten years is to seize hold of the time from June 1976, when the Plan was amended and restated, until January 1977, the date of the IRS–required First Amendment to the Plan. In a realistic sense, though, this time never existed since the First Amendment to the Plan was applied retroactively and had the same effective date—January 1, 1975—as the amended and restated Plan. We find no difficulty with this retroactive application, in part because to comply with ERISA it was required by the IRS.[11] Moreover, we agree with the district court that the DOL Regulation did not prohibit the First Amendment to the Plan being applied to Penn. The amendment itself did not result in a lessening of Penn's *vested percentage* of the accrued benefit since at the time the amendment was adopted, Penn had zero vesting in any benefits.

Finally, we agree with the district court that the Committee's determination was not arbitrary or capricious since the Committee's construction and interpretation of the Plan was uniformly applied to all Plan

10. The Committee determined that Penn was entitled to nine years and three months of service under the 1,000 hours method and nine years and four months under the elapsed time method.

11. At oral argument, Penn's counsel argued that this specific change was not required to bring the Plan into compliance with the IRS. Whether this particular change was mandated by the IRS is not something we need to resolve. The IRS approved the entire amendment, including its retroactive application, and that is enough.

participants and a fair reading of the Plan revealed that Penn received full single credit for all the time he was employed by Howe–Baker. *See Dennard, supra,* 681 F.2d at 314.

## VI.

█ Lastly, Penn argues that even if he were not fully vested in his accrued benefit on the date of his termination in 1984, he should be fully vested because he had not incurred a break in service as of the date the Plan terminated. A break in service is defined under the Plan as a twelve month consecutive period after a Plan member's severance, during which time the member does not complete one hour of service for the company. Penn bases his argument on IRS General Counsel Memorandum (GCM) 39310.

GCM 39310 provides that: (1) where a qualified plan provides that participants who separate from service will be paid their vested accrued benefits, a participant who separates from service and is paid vested accrued benefit need not become further vested if the plan terminates before the participant incurs a break in service; (2) a partially vested participant who terminates service and will not suffer a forfeiture of nonvested accrued benefits under the plan's terms until he or she incurs a one year break in service must be vested in accrued benefit to the extent funded, if the plan terminates prior to the incurring of a break in service.

The Committee found, and the trial court agreed, that the memorandum did not apply to the Howe–Baker plan. There is sufficient basis for such a conclusion. The trial court made a finding of fact that the GCM does not apply to the Howe–Baker Plan since it was a defined benefit plan

rather than a defined contribution plan.[12] Only a defined contribution plan can be a qualified plan under the GCM. Because this finding was based on expert testimony and because the language of the memorandum is specific as to qualified plans, we hold that this finding was sufficiently supported.

█ Even if the memorandum applied to defined benefit plans, however, the memorandum is not binding. It is an internal document reviewing a proposed ruling in a specific case. Even as an internal document, the IRS did not rely on it in this case. As the district court found, the IRS obviously did not apply the memorandum to Howe–Baker's termination of the Plan since it specifically approved all aspects of the termination.

Finally, even if the memorandum applied to the Plan in this case, it would not affect Penn's situation. Evidence indicates that Penn already had been "involuntarily cashed out." That is, the Pension Committee had directed the trustee to pay Penn his vested accrued benefits—$0.00—before the termination of the plan.[13] Consequently, the memorandum would not apply to Penn since he would not be further vested in the Plan.

On all these grounds, we find no error in the district court's finding that the Committee's conclusion regarding the memorandum is not arbitrary or capricious.

## VII.

Penn claims entitlement to attorney's fees and court costs under § 1132 of ERISA. The district court denied the award of those fees. Since Penn has not prevailed on any of his claims, we see no abuse of discretion in the court's decision to deny fees and costs.

---

**12.** The Committee drew the distinction between defined benefit plans and defined contribution plans. According to the Committee, a defined contribution plan is a money purchase pension plan. The difference between the two types of plans is that while under a contribution plan an employee would have an account balance, under a benefit plan there is no account balance.

**13.** Even though Howe–Baker introduced evidence of this directive at trial, Penn argues that since the evidence did not appear until a supplemental brief at trial, the Pension Committee could not have relied on it in making its determination. Since the Committee could have based, and did base, its decision on other grounds, the mere late entrance of this evidence does not mean that the Committee's decision was arbitrary or capricious.

In all respects we find the District Court not in error.

AFFIRMED.