**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

---

**No. 00-60367**

---

**MOSTAFA ABOUL-FETOUH,**

**Plaintiff-Appellant,**

**VERSUS**

**EMPLOYEE BENEFITS COMMITTEE, as Administrator and named**
**Fiduciary of the Group Insurance Plan; THE HARTFORD LIFE**
**AND ACCIDENT INSURANCE COMPANY, as the Group Insurance Plan;**
**ENTERGY OPERATIONS, INCORPORATED, a Division of Entergy**
**Corporation, as Fiduciary of the Group Insurance Plan,**

**Defendants-Appellees.**

---

Appeal from the United States District Court
for the Southern District of Mississippi

March 16, 2001

Before REAVLEY, SMITH, and DeMOSS, Circuit Judges.

DeMOSS, Circuit Judge:

This is an ERISA benefits case. Plaintiff-plan beneficiary Mostafa Aboul-Fetouh appeals from the district court's order granting summary judgment in favor of defendant-employer Entergy Operations, Inc. (Entergy), defendant-plan administrator Employee Benefits Committee (EBC), and defendant-claims administrator-insurer The Hartford Life and Accident Insurance Company (Hartford). We affirm.

**I.**

Between April 1989 and April 1997, Aboul-Fetouh, who has a masters degree in engineering, was employed by Entergy as a technical or senior engineer. In 1990, Entergy Corporation established the Entergy Corporation Companies' Benefits Plus Long Term Disability Plan (the plan). The plan meets the requirements of an employee welfare benefit plan as that term is defined in ERISA. *See* 29 U.S.C. § 1002(1). Entergy funded the plan with a group insurance policy issued by Hartford.

Any review of an ERISA benefit determination must begin with the relevant plan language.[1] The plan provides that it pays

---

[1] The record contains two versions of the relevant plan. One appears to be the original 1990 plan, as amended in 1992, while the other is an amended and restated version of the plan dated March 1, 1997. Aboul-Fetouh claims that his entitlement to disability benefits is controlled by the January 1990 plan, while the defendants maintain that his entitlement to benefits is controlled by the March 1997 plan. For the most part, the controlling terms material to our disposition are substantively identical in both plans. To the extent there is any relevant conflict in plan terms, we apply the terms set out in the 1990 plan. The March 1997 version of the plan was not promulgated until after Aboul-Fetouh was no longer entitled to benefits. Moreover, Hartford's final determination letter denying Aboul-Fetouh's claim for a continuation of long term disability payments appears to be based upon terms specific to the 1990 plan. While an administrator's decision to apply one version of the plan over another when making a benefit determination is entitled to some deference, *see* **Matassarin v. Lynch**, 174 F.3d 549, 564 (5th Cir. 1999), *cert. denied*, 120 S. Ct. 934 (2000); **Spacek v. Maritime Ass'n**, 134 F.3d 283, 292-93 (5th Cir. 1998), there is no like principle requiring deference to an administrator's decision to apply one version of the plan to deny benefits, and a second version to defend that decision in subsequent litigation. When these facts are construed in Aboul-Fetouh's favor, we conclude that the 1990 plan must be viewed as providing the controlling language

disability benefits:

> [T]o a Member if, while covered hereunder, the Member (i) becomes Totally Disabled; (ii) remains Totally Disabled throughout the Elimination Period; (iii) remains Totally Disabled beyond the Elimination Period; and (iv) submits proof of loss satisfactory to the Claims Administrator.

The plan defines total disability as follows:

> "<u>Totally Disabled</u>" means that during the Elimination Period and for the next 24 months, the Member is prevented by Disability from doing all the material and substantial duties of this own occupation. After that, "Totally Disabled" means that the Member is prevented by such Disability from doing any occupation or work for which he is or could become qualified by training, education, or experience.

The plan defines the elimination period as follows:

> "<u>Elimination Period</u>" means the first 6 months of any one period of Total Disability before benefits are payable under this Plan. Notwithstanding any other provision contained herein to the contrary, if a Member ceases to be Totally Disabled and returns to work for a total of 14 or fewer days during an Elimination Period, the Elimination Period shall not be interrupted or extended. Except as otherwise set forth herein, the Member must be Totally Disabled by the same condition for the entire Elimination Period.

Generally, a participant must be disabled by the same condition for the entire elimination period. Moreover, even a series of causally-related disabilities, each lasting less than six months alone, but adding up to an aggregate of six months when combined, will generally not suffice to establish total disability throughout the elimination period. There are, however, at least two

for purposes of this appeal.

3

exceptions. First, the elimination period will not be interrupted if the participant returns to work during the elimination period for a period of fourteen or fewer days. Second, when the participant suffers from a second period of disability which is (1) caused by the same or a related condition, and (2) begins within three months after the first period of disability terminates, then the second period of disability will be tacked on to the first period of disability and the two periods will be considered a single period of continuous disability under the plan. The plan terms describing this feature provide:

> "Period of Disability" means a continuous length of time during which a Member is Disabled under this Plan.
>
> Successive Periods of Disability. If successive Periods of Disability are (i) due to the same cause; or (2) due to a related cause; and (3) separated by 3 months or less; then such successive periods shall be considered one Period of Disability, provided the Plan remains in effect.

When, as here, the participant becomes totally disabled before age 62, the plan potentially provides long term disability benefits for a period of continuous disability until age 65. Benefits terminate earlier, however, upon the occurrence of any of the following circumstances:

> (i) the date the Member is no longer Disabled;
>
> (ii) the date on which the Member fails to furnish proof that he is continuously Disabled;
>
> (iii) the date on which the Member refuses to be examined, if the Claims Administrator requires an examination;

4

(iv) the date on which the Member first receives retirement benefits from a plan provided or sponsored by his Employer; [or]

(v) the date on which the Member dies.

Finally, the plan expressly limits the coverage for conditions "caused, contributed to, or made disabling by" most mental illnesses to a lifetime maximum of twenty-four months. The relevant plan term provides:

> <u>Additional Plan Limits</u>. Notwithstanding any other provision contained herein to the contrary, if the Member is Disabled because of: (i) psychosis or neurosis; (ii) any condition caused, contributed to, or made disabling by a psychosis or neurosis; . . . then, subject to all other provisions of this Plan, the Plan shall pay benefits only for so long as the Member is confined in a hospital or other place licensed to provide medical care for such Disability for at least 14 days; or when the Member is not so confined, for a total of 24 months for all such disabilities during his lifetime.

Having set forth the controlling plan terms, we turn to a consideration of the facts relating to Aboul-Fetouh's claim for long term disability benefits.

Aboul-Fetouh was first disabled by a knee injury in August 1993. Aboul-Fetouh filed a claim for long-term disability benefits, which Hartford approved. In March 1994, Aboul-Fetouh's treating physician, Dr. Tiwari, reported that Aboul-Fetouh was no longer totally disabled and that he could return to work at the end of April 1994. Aboul-Fetouh continued receiving benefits until he returned to work on May 2, 1994.

Shortly thereafter, in July 1994, Aboul-Fetouh became disabled

5

by a bout of major depression.  Aboul-Fetouh filed a second claim for long term disability benefits on July 15, 1994, which was accompanied by a statement from his psychiatrist, Dr. Coleman.  Dr. Coleman stated that Aboul-Fetouh was totally disabled by depression, but that Aboul-Fetouh was expected to make a "full recovery" and to return to work on at least a part-time basis in September 1994.

Earlier in July 1994, Aboul-Fetouh was seen by Dr. Tiwari and by another medical provider, Dr. Nordal, Ph.D.  Dr. Tiwari recorded that Aboul-Fetouh was being seen for a separate problem, documenting that Aboul-Fetouh was complaining of crying spells, memory loss, depression, and anxiety.  Dr. Tiwari conducted clinical studies, including an MRI and EMG studies.  The results of these studies were either within normal limits or reported only as minimally significant medical findings.  Dr. Nordal likewise concluded that Aboul-Fetouh had difficulty controlling his emotions and making decisions, and that Aboul-Fetouh was suffering from severe anxiety and depression.

Hartford approved Aboul-Fetouh's second claim, but informed Aboul-Fetouh that it was establishing a new elimination period beginning on July 15, 1994, the date of his second disability benefits claim, and ending six months later, on January 14, 1995. Hartford also informed Aboul-Fetouh that it intended to rely upon plan and policy language limiting coverage to a maximum of 24 months when the beneficiary is disabled by some form of mental

6

disability. Hartford subsequently paid long-term disability benefits to Aboul-Fetouh for the 24-month period beginning January 15, 1995 and ending January 14, 1997, and for a short time period thereafter, ending in March 1997.

In the two-year period that Aboul-Fetouh was receiving disability benefits, he was receiving treatment from Dr. Coleman for depression. During at least some of that period, he was also receiving medical treatment from Dr. Tiwari for chronic pain in his neck, chest, and lower back. In January 1996, Aboul-Fetouh also consulted a rheumatologist, who prescribed injections for pain.

When Aboul-Fetouh's entitlement to long-term disability benefits on the basis of his mental disability expired in January 1997, Aboul-Fetouh claimed that he was entitled to continued benefits because he was totally disabled by chronic pain, a condition that would not be subject to the twenty-four month limitation applicable to his claim for depression. Hartford arranged for a functional capacity evaluation to determine whether Aboul-Fetouh was totally disabled by chronic pain. The functional capacity evaluation report stated that Aboul-Fetouh could perform sedentary to light work, as required by his engineering position. The evaluation specifically reported that Aboul-Fetouh was able to lift 15 pounds floor-to-thigh and carry 20 pounds.

After receiving the functional capacity evaluation, Hartford forwarded the report, together with Aboul-Fetouh's file, to a Dr. Silver for an independent medical evaluation. Dr. Silver was

7

charged with deciding whether Aboul-Fetouh was totally disabled by a physical condition that would support the payment of benefits beyond the twenty-four months paid for Aboul-Fetouh's claim based upon depression and anxiety. Dr. Silver concluded that Aboul-Fetouh's depression was severe, but that he was physically capable of returning to the work required by his employment with Entergy. Hartford relied upon the functional evaluation and Dr. Silver's opinion to deny long-term disability payments beyond the twenty-four month period permitted for conditions "caused, contributed to, or made disabling by" a psychosis or neurosis.

In May 1997, after Hartford denied an extension of benefits, Aboul-Fetouh submitted Dr. Tiwari's statement that Aboul-Fetouh suffered from chronic pain syndrome or fibromyalgia. Aboul-Fetouh sought additional medical treatment for chronic pain in 1997 and 1998. While it is clear that Aboul-Fetouh was suffering from some level of chronic pain, Dr. Tiwari himself assigned only a ten percent disability rating to the whole body for the condition. Medical tests conducted in this period reveal "mild" abnormalities, but are likewise not supportive of Aboul-Fetouh's claim of total disability.

In October 1997, about nine months after Hartford discontinued disability payments, Aboul-Fetouh filed this lawsuit in federal district court under ERISA. *See* 29 U.S.C. § 1132(a)(1)(B) (providing that "a participant or beneficiary" may bring a civil

8

action "to recover benefits due him under the terms of the plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan"). Aboul-Fetouh sought to recover past and future long-term disability benefits, as well as attorney fees and costs.

In March 1998, the case was stayed by agreement of the parties pending Aboul-Fetouh's exhaustion of administrative remedies. While the case was stayed, Aboul-Fetouh and Hartford exchanged additional information relating to the extent of Aboul-Fetouh's disability and medical condition. In October 1998, Hartford subjected Aboul-Fetouh's complete file to a second independent medical evaluation. The subsequent report concluded that Aboul-Fetouh continued to suffer from severe and disabling depression, as well as fibromyalgia and other mild problems affecting his neck, shoulder and back, but that Aboul-Fetouh no longer had any continuing or totally disabling physical condition. The report concluded that Aboul-Fetouh was capable of returning to work.

In November 23, 1998, Hartford sent Aboul-Fetouh a final determination letter denying Aboul-Fetouh's claim for further benefits under the plan. Hartford concluded that Aboul-Fetouh's medical evidence failed to establish that he was totally disabled by a physical impairment when his entitlement to long-term disability benefits on the basis of the July 1994 depression and anxiety claim expired.

In December 1998, the district court removed the stay and set

scheduling deadlines. On June 15, 1999, defendant Hartford moved for summary judgment, arguing that there was no legal error and no abuse of discretion arising from its interpretation and application of the plan. Defendants EBC and Entergy filed a separate pleading joining in Hartford's motion and making an additional argument that neither EBC nor Entergy were proper parties to the suit.[2] After a hearing on the motions, the district court granted summary judgment in favor of the defendants.

## II.

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56. This Court reviews the district court's determination that the defendants were entitled to judgment as a matter of law de novo, applying the same standards as the district court. *See Duffy v. Leading Edge Prods.*, 44 F.3d 308, 310 (5th Cir. 1995).

A plan administrator's interpretation or application of the plan, including a denial of plan benefits challenged under § 1132(a)(1)(B), is reviewed de novo "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine

---

[2] Because we conclude that the administrator's interpretation of the plan was legally correct and that there was no abuse of the considerable discretion vested with the administrator in this case, we need not and do not consider this alternative basis for affirming the district court's summary judgment in favor of the defendants.

eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 109 S. Ct. 948, 956-57 (1989). Many plans, like the Entergy plan at issue here, vest plan administrators with broad discretion to interpret and apply to the plan. In such cases, the "administrator's interpretation of the plan and action based thereon" is reversed only for "an abuse of discretion." *Spacek v. Maritime Ass'n*, 134 F.3d 283, 292 (5th Cir. 1998) (citing *Bruch*, 109 S. Ct. at 956). The abuse of discretion standard applicable here is sometimes referred to or equated with an "arbitrary and capricious" standard of review. *See Matassarin v. Lynch*, 174 F.3d 549, 563 (5th Cir. 1999), *cert. denied*, 120 S. Ct. 934 (2000); *Penn v. Howe-Baker Eng'rs*, 898 F.2d 1096, 1100 & n.2a (5th Cir. 1990).

"[T]he abuse of discretion standard may involve a two-step process." *Spacek*, 134 F.3d at 292. First, the court determines whether the administrator's interpretation of the plan is legally correct. *Id*. at 292; *Threadgill v. Prudential Securities Group, Inc.*, 145 F.3d 286, 292 (5th Cir. 1998). For this analysis, plan language is preeminent. If the court determines that the plan administrator's interpretation of the plan is legally correct, then the administrator's interpretation and the denial of benefits should be upheld because there cannot have been any abuse of discretion. *See Spacek*, 134 F.3d at 292. If, on the other hand, the court determines that the plan administrator's interpretation

11

is *not* legally correct, then the court must proceed to determine whether the administrator's decision denying benefits was an abuse of discretion. *See* **Threadgill**, 145 F.3d at 293; **Spacek**, 134 F.3d at 292-93. The district court's determination that the plan administrator either did or did not abuse its discretion by denying benefits is reviewed de novo. *See* **Threadgill**, 145 F.3d at 292.

## III.

Aboul-Fetouh argues that Hartford abused its discretion by failing to treat the August 1993 period of disability and the July 1994 period of disability as a single period of disability under the successive disability provision of the plan. In a related argument, Aboul-Fetouh maintains that Hartford's benefit determination was an abuse of discretion because he has been continuously and totally disabled by chronic pain since 1993.

Hartford defends its application of the successive disability provision. Hartford maintains that its factual determination that the August 1993 knee injury claim and the July 1994 depression claim and subsequent period of disability had different and unrelated causes is supported by substantial evidence in the record.

We agree. Dr. Tiwari's records reflect that Aboul-Fetouh had reached a normal state and was ready to return to work in late April 1994. When Aboul-Fetouh returned to Dr. Tiwari in July 1994, it was for the "separate" problem arising from crying spells,

12

memory loss, depression, and anxiety. Aboul-Fetouh's subsequent problems with that condition are well documented by those physicians providing medical care in July 1994. While Aboul-Fetouh may have continued to experience symptoms of pain in his neck, shoulder, and back, there is no evidence that would support a reasonable inference of total disability caused by such pain in July 1994. We conclude, therefore, that Hartford did not apply an incorrect interpretation of the plan and did not abuse its discretion in refusing to tie Aboul-Fetouh's August 1993 claim for total disability caused by his knee injury and complications arising from that injury and his July 1994 claim for depression and anxiety together as a single continuing period of disability.

Aboul-Fetouh next maintains that Hartford abused its discretion because the summary judgment evidence is sufficient to create a fact question concerning whether he has been totally physically disabled by chronic pain since 1993. Aboul-Fetouh does not dispute that there are no objective medical records tending to support his claim, but contends that Hartford cannot rely upon that evidentiary deficiency because Dr. Tiwari explained that there is no known etiology for his complaints of chronic pain, and therefore no way to conclusively establish disabling pain with objective medical evidence.

We find no abuse of discretion in Hartford's benefit determination. As an initial matter, the record evidence simply does not support Aboul-Fetouh's assertion that he was continuously

13

disabled between 1993 and 1997.  In April 1994, Dr. Tiwari reported that Aboul-Fetouh was fit and ready to return to work.  Aboul-Fetouh did in fact return to work until he became disabled by anxiety and depression in July 1994.  Even as late as June 1997, Dr. Tiwari assigned only a ten percent disability rating on the basis of Aboul-Fetouh's chronic pain and myofascial syndrome. Moreover, we note that the key issue in this case is whether Aboul-Fetouh was totally disabled by chronic pain as of March 1997, when Hartford terminated benefits.  Without regard to whether Aboul-Fetouh was totally disabled by chronic pain between 1993 and that time, the plan provides that benefits terminate when the participant can no longer furnish proof of total disability.  There is no dispute about the fact that Aboul-Fetouh exhausted his entitlement to benefits on the basis of his July 1994 claim for depression and anxiety.  Once those benefits were exhausted, Aboul-Fetouh would not have been entitled to additional benefits unless he could demonstrate total disability as of March 1997.

Hartford's denial of benefits was expressly tied to the extensive medical evidence in this record.  Hartford's determination was supported by the functional capacity test results, and the two independent medical evaluations concluding that Aboul-Fetouh could perform the level of work required for his position at Entergy.  While Aboul-Fetouh offers some evidence that he continued seeking some treatment for pain, that evidence does not indicate that Aboul-Fetouh suffered from those symptoms at such a level that

14

he would have been unable to perform his work, the standard required to support a finding of total disability.

Neither does Dr. Tiwari's statement that chronic pain is hard to verify with objective medical evidence create a triable issue of fact. Once Hartford demonstrated the absence of proof to support Aboul-Fetouh's claim of total disability, Aboul-Fetouh bore the burden of coming forward with "concrete evidence" that there was a genuine issue of material fact for trial. *See* **Duffy**, 44 F.3d at 310; *see also* **Douglass v. United Serv. Auto. Ass'n**, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc) ("conclusory allegations, speculation, and unsubstantiated assertions" are inadequate to satisfy the non-movant's burden). Even assuming that chronic pain may not be verified by any form of objective medical testing, objective medical evidence is not the only means for establishing an inability to perform relevant work. As just one example, Aboul-Fetouh could have offered evidence directly contradicting Hartford's evidence of his residual capacity for work.

Notwithstanding plenty of time for discovery and the development of adequate medical records, Aboul-Fetouh has not produced probative evidence that he could not perform the substantial duties of his job in March 1997. Hartford's interpretation of the successive disability provision and other plan provisions is consistent with a fair reading and should be considered legally correct as a matter of law. Hartford's decision

15

that Aboul-Fetouh did not suffer from any totally disabling physical condition in March 1997 was based upon sound evidence and was not an abuse of the discretion vested with Hartford by the relevant plan terms.

For the foregoing reasons, the district court's grant of summary judgment in favor of defendants Entergy Operations, Inc., Employee Benefits Committee, and The Hartford Life and Accident Insurance Company is **AFFIRMED**.