REVISED, February 10, 1998

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 96-20480

_____

DANIEL A SPACEK,

                    Plaintiff-Appellee,

v.

THE MARITIME ASSOCIATION, I L A PENSION PLAN, and
Trustees of the Agreement of Trust,

                    Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Texas
_____

January 22, 1998

Before KING and PARKER, Circuit Judges, and ROSENTHAL,[*] District

Judge.

KING, Circuit Judge:

     Daniel A. Spacek sued the Maritime Association - I.L.A.

Pension Plan and its trustees, alleging that they wrongfully

suspended payment of his early retirement benefits pursuant to a

plan amendment adopted after he retired, in violation of the

Employee Retirement Income Security Act and the common law of

contracts.  Both sides filed motions for summary judgment, and

_____

     [*] District Judge of the Southern District of Texas, sitting
by designation.

the district court granted in part and denied in part each motion. The district court granted Spacek's motion for summary judgment on the basis that the application of the amendment to Spacek was arbitrary and capricious because it deprived him of vested rights. We conclude that the district court erred in granting this portion of Spacek's motion, and we reverse and remand for entry of judgment against Spacek.

## I. BACKGROUND

The Maritime Association - I.L.A. Pension Plan and its trustees (collectively "the Plan") operate a multiemployer pension plan providing retirement benefits to employees in the longshoring industry from Brownsville, Texas to Lake Charles, Louisiana. The Plan is subject to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001-1461.

On November 1, 1985, Spacek, who worked for thirty years in the Houston longshoring industry for an entity covered by the Plan, retired at age fifty-one. Under the provisions of the Plan, Spacek qualified as an early retiree because he had not yet reached sixty-five years of age.

At the time Spacek retired, section 9.1(d)(2) of the Plan provided the following:

> If a Retired Participant is reemployed in the industry prior to his Normal Retirement Age, payment of his Age or Vested Pension and Temporary Bridge Benefit, if any, shall immediately cease and he shall immediately become an Active Participant. Such a Participant shall not be entitled to an Age or Vested Pension or Temporary Bridge Benefit while he continues to be employed in the industry or, if greater, for a period of six (6) months measured from the due date of the first monthly installment of his Age or Vested Pension which is withheld pursuant to this Paragraph.

Section 9.1(b)(2) defined "employment in the industry" as follows:

A Participant who is eligible for an Age or Vested Pension shall be considered to be "employed in the industry", or to be continuing his "employment in the industry," during a month if, and only if, both of the following conditions are met:

(i)  he is employed in the same industry, in the same trade or craft, and in the same geographic area covered by this Plan, as when he first became eligible for such pension; and

(ii) he is credited with at least one (1) Credit Hour for the Payroll Period ending in such month.[1]

Section 15.1 of the Plan reserved the following amendment power:

The Trustees may amend the Plan, from time to time, in any manner not in conflict with the terms of the Trust; provided, however, that no such amendment will cause or

---

[1]  Section 3.1 of the Plan provides the following description of "credit hours" and their computation during the time period relevant to this case:

An Employee's Credit Hours for any Year during the period January 1, 1937, through September 30, 1976, shall be the hours for which he was compensated, or entitled to compensation, by the Employers for periods during which he was an Employee.  . . .

An Employee's Credit Hours for any Year beginning on or after October 1, 1956, shall be the hours for which contributions are made by the Employers pursuant to Section 4 of Article 1 of the Trust, as determined by reports submitted by the Employers, either directly or through the Centralized Payroll System, to the Administrative office of the Trust.

For Years beginning on or after October 1, 1976, an Employee's Credit Hours shall be based on his 'Hours of Service'.  An 'Hour of Service' is each hour during an applicable computation period for which an Employee is directly or indirectly paid, or entitled to payment, by an Employer for the performance of duties or for reasons other than the performance of duties . . . .

3

permit any part of the Trust properties to be diverted to purposes other than for the exclusive benefit of the Participants or their spouses or permit any part of the Trust properties to revert to or become the property of the Employers.

On April 17, 1991, the Plan adopted an amendment changing the definition of "employment in the industry" under section 9.1(b)(2) by removing the requirement that a participant receive one credit hour before early retirement benefits would be subject to suspension for reemployment (the "Amendment"). A copy of the formal Notice To Participants Eligible For Age Or Vested Pension was mailed to the participants of the Plan on March 12, 1991. This document informed Spacek that payment of his benefits could be suspended if he became reemployed in the same industry, in the same trade or craft, and in the same geographic area covered by the Plan, regardless of whether such employment was with a signatory of the Plan. On May 8, 1991, a second notice was mailed to the participants, informing them that the Amendment would take effect on June 1, 1991.[2]

Approximately three years later, on April 28, 1994, Spacek began working as a superintendent for James J. Flanagan Stevedores of Houston. Flanagan is a signatory employer to the Plan. Spacek's return to work constituted reemployment in the industry under amended section 9.1(b)(2), but, because he did not

_____

[2] The district court concluded as a matter of law that Spacek had notice of the Amendment, and Spacek does not challenge this determination on appeal.

4

receive any credit hours for his work,[3] not under section 9.1(b)(2) as it existed at the time Spacek retired. Following his reemployment, the Plan suspended payment of Spacek's pension benefits for six months based on the Amendment.

On February 7, 1995, Spacek filed suit in federal district court against the Plan to recover the suspended early retirement benefits. Both sides filed motions for summary judgment, and the district court granted in part and denied in part both motions. In doing so, the district court determined that the application of the Amendment to Spacek and the resulting suspension of payment of his early retirement benefits, while not violative of

---

[3] Section 3.1 indicates that credit hours are only accumulated by those individuals who qualify as "employees" under the Plan's definition of that term. See supra note 1. Section 2.5 defines "employee" as follows:

"Employee" shall mean any person:

(1) Who is a water-front employee of the Employers whose wage rates and working conditions are established by collective bargaining agreements between the Union and the Employers; or

(2) Who is a walking foreman; or

(3) Who is a bona fide representative in the employ of any Local Union or of the South Atlantic and Gulf Coast District, I.L.A., and a bona fide resident of the area between Lake Charles, Louisiana and Brownsville, Texas; or

(4) For whom contributions are paid to the Trust by the West Gulf Maritime Association by reason of a guaranteed annual income agreement between the Employers and the Union.

Spacek's employment as a superintendent for James J. Flanagan Stevedores did not qualify him as an "employee" under the above definition. As such, he has accumulated no credit hours under the Plan while so employed.

5

any particular provision of ERISA, was nonetheless arbitrary and capricious, and thus unlawful.  See Spacek v. Trustee of the Agreement of Trust for Maritime Ass'n-I.L.A. Pension Plan, 923 F. Supp. 960, 963-64 (S.D. Tex. 1996).  Specifically, the district court rejected Spacek's argument that application of the Amendment to him violated the anticutback provisions of 29 U.S.C. § 1054(g).  See id. at 963.  However, the court also concluded that application of the Amendment to Spacek was arbitrary and capricious because it deprived him of rights that vested contractually at the time of his retirement.  See id. at 963-64.

The district court entered final judgment awarding Spacek, among other things, $12,998.95 in retirement benefits.  The Plan filed a timely notice of appeal.

## II.  STANDARD OF REVIEW

"We review the grant of a summary judgment de novo, applying the same criteria used by the district court in the first instance."  Texas Medical Ass'n v. Aetna Life Ins. Co., 80 F.3d 153, 156 (5th Cir. 1996).  Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).

## III.  DISCUSSION

ERISA regulates pension benefits through statutory accrual and vesting requirements.  See 29 U.S.C. §§ 1053, 1054.  In

6

addition to these statutory protections, when an employer imposes upon itself extra-ERISA contractual obligations in its employee benefits plan, these extra-ERISA obligations are rendered enforceable by contract law.  Wise v. El Paso Natural Gas Co., 986 F.2d 929, 937-38 (5th Cir. 1993); Vasseur v. Halliburton Co., 950 F.2d 1002, 1006 (5th Cir. 1992).  Section 1132 of the statute creates a procedural mechanism for enforcing a plan participant's rights, whether predicated upon ERISA's statutory protections or upon the federal common law of contracts.[4]  See HENRY H. PERRITT, JR., EMPLOYEE BENEFITS CLAIMS LAW AND PRACTICE § 3.3 (1990) ("ERISA establishes two different kinds of federal rights.  The first kind of right is statutory . . . .  The second kind of right relates to obligations created under the common law of trusts or the common law of contracts."); cf. In re HECI Exploration Co., Inc., 862 F.2d 513, 523 n.18 (5th Cir. 1988) (concluding that "§ 1132(a)(1)(B) was intended to create a federal common law concerning pension rights which would augment the rights created by ERISA's substantive provisions").

We conclude that the Plan's application of the Amendment to Spacek violated neither the Plan's statutory nor contractual obligations.

---

[4]  Section 1132(a)(3) provides that a participant or beneficiary may bring a civil action "to enforce any provisions of this subchapter or the terms of the plan."  29 U.S.C. § 1132(a)(3) (emphasis added). Additionally, § 1132(a)(1)(B) provides that a participant or beneficiary may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan[.]"  Id. § 1132(a)(1)(B).

## A. Compliance with ERISA

Questions of statutory interpretation are questions of law and are thus reviewed de novo. Estate of Bonner v. United States, 84 F.3d 196, 197 (5th Cir. 1996). We therefore conduct a de novo review in order to determine whether the Plan's application of the Amendment to Spacek comported with ERISA's statutory requirements. See Penn v. Howe-Baker Eng'rs, Inc., 898 F.2d 1096, 1100 (5th Cir. 1990) ("[W]e accord no deference to the [plan administrators'] conclusions as to the controlling law, which involve statutory interpretation.").

Spacek contended in the district court, and again urges on appeal as an alternative ground for affirmation of the district court's judgment, that application of the Amendment to him violated the anticutback provisions of 29 U.S.C. § 1054(g).

Section 1054(g) provides as follows:

(1) The accrued benefit of a participant under a plan may not be decreased by an amendment to the plan, other than an amendment described in section 1082(c)(8) or 1441 of this title.[5]

(2) For purposes of paragraph (1), a plan amendment which has the effect of--

(a) eliminating or reducing an early retirement benefit or a retirement-type subsidy (as defined in regulations), or

(b) eliminating an optional form of benefit,

with respect to benefits attributable to service before the amendment shall be treated as reducing accrued benefits.

---

[5] None of the parties contend that the Amendment is authorized by § 1082(c)(8) or § 1441.

8

29 U.S.C. § 1054(g).

Spacek argues that application of the Amendment to him violated § 1054(g) because the Amendment decreased his early retirement benefit. As such, he argues, § 1054(g)(2) dictates that the Amendment must be treated as an amendment reducing accrued benefits, and that § 1054(g)(1) prohibits such an amendment. Spacek's theory is that the suspension of benefit payments amounts to a reduction in benefits because he will never recover those suspended benefits and thus the cumulative total of benefits he will receive over his lifetime has been reduced. The district court rejected this argument, Spacek, 923 F. Supp. at 963, and so do we. While Spacek's interpretation of § 1054(g) has some logical appeal, it fails to comport with the plain language of § 1054(g), the provision's legislative history, and relevant interpretive regulations.

### 1. Statutory Language

Spacek's reading of § 1054(g) is contrary to the wording of the ERISA statute.[6] Throughout the statute and corresponding regulations, the concepts of reduction of benefits and suspension of benefit payments are used in distinct ways, often within a

---

[6] Research reveals only one reported opinion addressing the issue of whether suspension of early retirement benefits amounts to a reduction. In Whisman v. Robbins, 55 F.3d 1140 (6th Cir. 1995), the Sixth Circuit stated that § 1054(g)(2) does not apply when early retirement benefits are suspended because a suspension is not a reduction or elimination. Id. at 1147. However, the court undermined the impact of this statement by concluding that the plaintiff would have lost even under the unamended plan. Id. Thus, while we agree with Whisman, we do not rely on it, instead basing our holding on our independent statutory analysis.

single provision.  For example, § 1441 provides procedures regarding disposition of benefits under terminated plans, instructing that "the plan sponsor of a terminated multiemployer plan to which section 1341a(d) of this title applies shall amend the plan to <u>reduce benefits</u>, <u>and</u> shall <u>suspend benefit payments</u>, as required by this section."  29 U.S.C. § 1441(a) (emphasis added).  Section 1341a(d) instructs that "[t]he plan sponsor of a plan which terminates under . . . this section shall <u>reduce benefits and suspend benefit payments</u> in accordance with section 1441 of this title."  29 U.S.C. § 1341a(d) (emphasis added).  Similarly, § 1342, which governs termination of a plan by the Pension Benefit Guarantee Corporation, provides for the appointment of a trustee with the power, "in the case of a multiemployer plan, to <u>reduce benefits or suspend benefit payments</u> under the plan."  29 U.S.C. § 1342(d)(1)(A)(v) (emphasis added).[7]

The regulations adopted pursuant to ERISA also indicate that a distinction exists between reduction of benefits and suspension of benefit payments.  For example, the regulations specify two situations in which a summary plan description must provide a

---

[7]  <u>See also</u> 29 U.S.C. § 1053(a)(3)(E)(ii) ("A participant's right to an accrued benefit derived from employer contributions under a multiemployer plan shall not be treated as forfeitable solely because . . . the plan is amended to <u>reduce benefits</u> under section 1425 or 1441 of this title, or . . . <u>benefit payments</u> under the plan may be <u>suspended</u> under section 1426 or 1441 of this title." (emphasis added)); <u>id.</u> § 1301(a)(8) (defining "nonforfeitable benefit" in the context of plan termination insurance and noting that the definition applies "whether or not the benefit may subsequently be <u>reduced or suspended</u> by a plan amendment" (emphasis added)).

description of any plan provision under which a benefit or benefit payment "may be reduced, changed, terminated, forfeited or suspended."  29 C.F.R. §§ 2520.104b-4(a)(1)(iii), (a)(2)(iv) (emphasis added).

To interpret reduction of benefits as including suspension of benefit payments would make the word "suspension" redundant in all of these statutory provisions and interpretive regulations, which is contrary to the rule of statutory construction that each word must be given meaning.  See Bailey v. United States, 116 S. Ct. 501, 506 (1995) (noting the "assumption that Congress intended each of its terms [in a statutory scheme] to have meaning").  Thus, under the plain language of the statute, a suspension of benefit payments is not a reduction of benefits, and the district court did not err in determining that the Plan's application of the Amendment to Spacek did not violate § 1054(g) by reducing early retirement benefits.  This conclusion finds further support in the legislative history of § 1054(g)(2).

## 2.  Legislative History

The legislative history of the Retirement Equity Act of 1984, Pub. L. No. 98-397, 98 Stat. 1426 ("REA"), which added paragraph (2) to § 1054(g), supports the conclusion that § 1054(g)(2) does not preclude application of the Amendment to Spacek.  During congressional debate, Representative William Clay, who introduced the House bill that ultimately became the REA, made the following statement regarding the section of the bill that would become § 1054(g)(2):

11

In addition, I wish to further clarify the anticutback provisions of section 301 of the bill. Those provisions are not intended to apply to benefit changes authorized by existing law; for example, they do not restrict the right of multiemployer pension plans under ERISA sections 203(a)(3)(E) and 4210(b)(3) and code section 411(a)(3)(E) to disregard past service credit when an employer ceases to be obligated to contribute. Nor do those provisions in any way apply to or affect the provisions of ERISA section 203(a)(3)(B)[29 U.S.C. § 1053(a)(3)(B)] and code section 411(a)(3)(B) relating to the suspension of benefits for postretirement employment, including the authorization for multiemployer plans to adopt stricter rules for the suspension of subsidized early retirement benefits.

130 CONG. REC. 23,487 (1984)(emphasis added). The above clarification indicates that § 1053(a)(3)(B), which authorizes suspension of payment of accrued benefits under a multiemployer plan based on employment subsequent to commencement of payment of such benefits "in the same industry, in the same trade or craft, and in the same geographic area covered by the plan, as when such benefits commenced," 29 U.S.C. § 1053(a)(3)(B)(ii),[8] also

---

[8] The regulations promulgated under § 1053(a)(3)(B) indicate that the power of pension benefit plans to suspend early retirement benefits upon reemployment is even broader than the power of such plans to suspend retirement benefits available at normal retirement age:

A plan may provide for the suspension of pension benefits which commence prior to the attainment of normal retirement age, or for the suspension of that portion of pension benefits which exceeds the normal retirement benefit, or both, for any reemployment and without regard to the provisions of section 203(a)(3)(B) [29 U.S.C. § 1053(a)(3)(B)] and this regulation to the extent (but only to the extent) that suspension of such benefits does not affect a retiree's entitlement to normal retirement benefits payable after attainment of normal retirement age, or the actuarial equivalent thereof.

29 C.F.R. § 2530.203-3(a) (emphasis added).

12

authorizes the very type of amendment at issue in this case, and that § 1054(g) in no way limits this authorization.  We reach this conclusion based on the fact that § 1054(g) does nothing more than prohibit retroactive application of certain types of amendments.  Accordingly, § 1054(g) can be construed as having a potential impact on § 1053(a)(3)(B) only if § 1053(a)(3)(B) authorizes retroactive application of amendments that provide for suspension of benefit payments based upon reemployment.  Relevant federal regulations further bolster this conclusion.

### 3.  Relevant Regulations

Treasury Regulations adopted under 26 U.S.C. § 411, the section of the Internal Revenue Code that largely mirrors the accrual provisions of ERISA, 29 U.S.C. § 1054, further compel us to reject Spacek's argument that the Plan's application of the Amendment to him violates § 1054(g) by virtue of the fact that it will reduce the total amount of pension benefits that he will receive in his lifetime.  Before turning to a discussion of the relevant regulations, we first must look to ERISA's definition of accrued benefits.

Section 1002(23) of ERISA states that

> [t]he term "accrued benefit" means[,] . . . in the case of a defined benefit plan, the individual's accrued benefit determined under the plan and, except as provided in section 1054(c)(3) of this title, expressed in the form of an annual benefit commencing at normal retirement age . . . .

29 U.S.C. § 1002(23).  Section 1054(c)(3) in turn provides in relevant part as follows:

> For purposes of this section, in the case of any

13

> defined benefit plan, if an employee's accrued benefit
> is to be determined as an amount other than an annual
> benefit commencing at normal retirement age [e.g., an
> early retirement benefit], . . . the employee's accrued
> benefit . . . shall be the actuarial equivalent of such
> benefit . . . .

29 U.S.C. § 1054(c)(3).

Section 411(c)(3) of the Internal Revenue Code, 26 U.S.C. § 411(c)(3), mirrors the provisions of 29 U.S.C. § 1054(c)(3). The Treasury Regulations promulgated under § 411(c)(3) repeat the general rule that, where an employee's pension benefit commences at a time other than normal retirement age, the accrued portion of such a benefit is the actuarial equivalent of the retirement benefit available at normal retirement age. 26 C.F.R. § 1.411(c)-1(e). In other words, an early retirement benefit is accrued under the regulation to the extent that it has been actuarially reduced to compensate for the fact that it is paid before normal retirement age. However, the Treasury Regulations go on to provide that, for purposes of computing the actuarial equivalent of a retirement benefit available at normal retirement age, "[n]o adjustment to an accrued benefit is required on account of any suspension of benefits if such suspension is permitted under section 203(a)(3)(B) of the Employment Retirement Income Security Act of 1974 [29 U.S.C. § 1053(a)(3)(B)]." 26 C.F.R. § 1.411(c)-1(f). Thus, in calculating a plan participant's accrued benefit where the plan participant is receiving early retirement benefits, the calculation of the accrued benefit need not account for the decrease in total benefits paid as a result of a suspension authorized by 29 U.S.C.

14

§ 1053(a)(3)(B).

As noted above, § 1053(a)(3)(B) authorizes suspension of accrued benefits under a multiemployer plan based on employment subsequent to payment of accrued benefits "in the same industry, in the same trade or craft, and in the same geographic area covered by the plan, as when such benefits commenced." 29 U.S.C. § 1053(a)(3)(B)(ii). This is precisely the type of suspension that occurred when the Plan applied the Amendment to Spacek.

Based on the above Treasury Regulations and § 1053(a)(3)(B), we conclude that, when an amendment to a plan calls for a suspension of benefit payments authorized by § 1053(a)(3)(B), as is the case here, the amendment does not decrease accrued benefits within the meaning of § 1054(g)(1). This is so because the reduction in total benefits paid over the lifetime of the plan participant as a result of the suspension need not be accounted for actuarially in computing the participant's accrued benefit under § 1054(c)(3) in the first instance. See 26 C.F.R. § 1.411(c)-1(f). Therefore, an amendment authorizing such a suspension does not serve to decrease the participant's accrued benefits, and thus cannot violate § 1054(g).

To the extent that an amendment such as the one at issue here would not violate § 1054(g) if it were applied to suspend fully accrued benefits, it plainly cannot violate § 1054(g) if it is applied to early retirement benefits, which may or may not be

15

fully accrued.[9]  The legislative history of the REA indicates

that the fundamental purpose behind the addition of paragraph (2)

to § 1054(g) was to afford early retirement benefits and

retirement-type subsidies the same form of protection from

_____

[9]  A split exists among the circuits as to the extent to which early retirement benefits are accrued benefits under ERISA's definition of that term.  The Third, Fourth, Eighth, and Tenth Circuits have held that §§ 1002(23) and 1054(c)(3), along with the legislative history of ERISA, indicate that an early retirement benefit that has been actuarially reduced to reflect its payment prior to normal retirement age constitutes an accrued benefit and any excess value over the actuarial equivalency is unaccrued.  See Atkins v. Northwest Airlines, Inc., 967 F.2d 1197, 1201 (8th Cir. 1992); American Stores Co. v. American Stores Co. Retirement Plan, 928 F.2d 986, 990-94 (10th Cir. 1991); Tilley v. Mead Corp., 927 F.2d 756, 759-60 (4th Cir. 1991); Bencivenga v. Western Pa. Teamsters and Employers Pension Fund, 763 F.2d 574, 577-78 (3d Cir. 1985).  The Second Circuit has held that, under § 1002(23), the full amount of the early retirement benefit calculated by the same formula as the normal retirement age benefit, including the amount by which the benefit exceeds the actuarial equivalent of the retirement benefit at normal retirement age adjusted for early payment, is accrued.  See Amato v. Western Union Int'l, Inc., 773 F.2d 1402, 1407-08 (2d Cir. 1985).

We need not resolve this issue because Spacek has only argued that application of the Amendment to him violated § 1054(g) by virtue of the fact that it reduced or eliminated his early retirement benefits, and thus should be treated as having reduced his accrued benefits per § 1054(g)(2).  Because Spacek's argument rests upon § 1054(g)(2), we are not called upon to conclude whether his early retirement benefits actually are accrued benefits under ERISA's definition of the term.

We acknowledge that, in Harms v. Cavenham Forest Industries, Inc., 984 F.2d 686 (5th Cir. 1993), a panel of this court apparently concluded that benefits protected by § 1054(g)(2) are "vested or accrued."  See id. at 691-92 (concluding that § 1054(g)(2) "prohibits the elimination or reduction of retirement benefits that have already vested or accrued").  The issue of whether early retirement benefits or retirement-type subsidies are accrued benefits for all purposes under ERISA was not before the court in Harms, nor is it before us in this case.  We therefore decline to address the issue of whether § 1054(g)(2) renders early retirement benefits accrued benefits for all purposes under ERISA.

16

reduction by amendment afforded to accrued benefits.  The House Committee on Ways and Means stated that this portion of the REA "codifie[d] present law generally precluding the elimination or reduction of benefits that have already been accrued by employees."  H.R. REP. NO. 98-655, pt. 2, at 25-26 (1984).  Furthermore, the Senate Finance Committee's report on the REA states that, "under the bill, as under present law, the accrued benefit of a participant is not to be decreased by an amendment of a plan.  The bill clarifies the scope of the prohibition against such decreases."  S. REP. NO. 98-575, at 27-28 (1984), reprinted in 1984 U.S.C.C.A.N. 2547, 2573-74.  This legislative history indicates that, if an amendment would not violate § 1054(g) if applied to fully accrued benefits, then it also cannot violate § 1054(g) if applied to early retirement benefits.

Because we conclude that the Amendment in this case would not violate § 1054(g) if it were applied to suspend a plan participant's fully accrued benefits, we in turn conclude that the Plan's suspension of Spacek's early retirement benefits pursuant to the Amendment did not violate § 1054(g).  However, as noted earlier, our inquiry does not end here because employers may obligate themselves contractually to provide benefits at a level exceeding ERISA's minimum requirements for pension plans. See Wise, 986 F.2d at 937-38; Vasseur, 950 F.2d at 1006.  Thus, we turn to the federal common law of contracts in order to determine whether application of the Amendment to Spacek constituted a breach of the Plan.

17

## B. Contract Law

### 1. Statutory Restriction of the Plan's Ability to Contractually Limit Its Amendment Power

As an initial matter, we address the Plan's argument that we should not conduct a contract law analysis of the propriety of applying the Amendment to Spacek because doing so would result in "the establishment of a federal common law of pensions to supersede the provisions of ERISA and ignores the fiduciary obligations of plan trustees to administer pension plans for the benefit of all participants." The thrust of the Plan's argument appears to be that, because ERISA specifically authorizes employers to suspend plan participants' receipt of early retirement benefits upon reemployment in the industry, trade or craft, and geographic area covered by an employee benefit plan, see 29 U.S.C. § 1053(a)(3)(B), contract law cannot operate to deny an employer the right to make such a suspension.

This court has held that "[a]n employer can oblige itself contractually to maintain benefits at a certain level in ways that are not mandated by ERISA." Vasseur, 950 F.2d at 1006; see also Wise, 986 F.2d at 937. However, we have never had occasion to determine whether ERISA places any substantive limits on the extent to which an employer may contractually obligate itself to exceed ERISA's minimum statutory requirements. Because we conclude that, at least in the respect at issue here, the Plan has not contractually obligated itself to maintain benefits at a level any higher than that required by ERISA, we express no opinion on whether ERISA imposes any substantive limits on an

employer's ability to contractually obligate itself not to suspend benefits in a manner otherwise authorized by the statute. We assume without deciding that, contrary to the situation that obtains here, the Plan could have contractually bound itself not to amend the Plan.

## 2.  Standard of Review

Where, as here, an ERISA plan grants its administrators discretion in interpreting plan provisions,[10] we will set aside an administrator's interpretation of the plan and action based thereon only upon a showing of an abuse of discretion.  See Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); Sunbeam-Oster Co. Group Benefits Plan v. Whitehurst, 102 F.3d 1368, 1373 (5th Cir. 1996).  As the district court observed, application of the abuse of discretion standard may involve a

---

[10]  Section 3.5 of the Agreement of Trust for Maritime Association - I.L.A. Pension Fund provides the trustees of the Plan with broad discretion in administering the Plan:

> Subject to the stated purposes of the Fund and the provisions of this Agreement, . . . the Trustees shall have full and exclusive authority to determine all questions of coverage and eligibility, methods of providing or arranging for benefits and all other related matters.  They shall have full power to construe the provisions of this Agreement and the terms used herein.  Any such determination and any such construction adopted by the Trustees shall be binding upon all the parties hereto and the beneficiaries hereof.  The Trustees shall be free to use their own judgment and discretion in all things pertaining to the affairs of the Trust.

The district court concluded that the trustees of the Plan had discretion in interpreting the Plan's provisions, and none of the parties challenge this conclusion on appeal.  See Spacek, 923 F. Supp. at 963.

19

two-step process. The court must initially determine whether the administrator's interpretation of the plan is the legally correct interpretation. See Wildbur v. ARCO Chemical Co., 974 F.2d 631, 637 (5th Cir.), modified, 979 F.2d 1013 (5th Cir. 1992). If the administrator's interpretation of the plan is legally correct, then the inquiry ends because no abuse of discretion could have occurred. However, if the court determines that the administrator's interpretation is not legally correct, then it must further determine whether the administrator's decision was an abuse of discretion. See id.

The district court concluded that the standard of review set out above "does not fully contemplate a situation where the plan administrator is interpreting a retroactive plan amendment" because "[i]n this situation, the issue is not whether the amendment is applied according to its terms, but rather, whether the amendment can be applied at all due to its retroactive nature." Spacek, 923 F. Supp. at 964. We disagree with the district court's conclusion because, to the extent that we have concluded that nothing in ERISA prohibits retroactive application of the Amendment to Spacek in this case, whether the Amendment can be retroactively applied to him will be determined by the terms of the Plan itself. Unless the Plan's language indicates that it has contractually obligated itself not to do what ERISA would otherwise entitle it to do, i.e., unless the terms of the Plan prohibit adoption of an amendment providing for the suspension of retired participants' benefit payments upon their

20

reemployment in the same industry, trade or craft, and geographic area in any capacity, no basis exists for concluding that the Plan's application of the Amendment to Spacek constituted an abuse of discretion.  See Wise, 986 F.2d at 937.

### 3. Legally Correct Interpretation of the Plan

"[E]xtra-ERISA commitments must be found in the plan documents and must be stated in clear and express language."  Id.  "[C]ourts may not lightly infer an intent" on the part of a plan to "voluntarily undertak[e] an obligation to provide vested, unalterable benefits."  Gable v. Sweetheart Cup Co., 35 F.3d 851, 855 (4th Cir. 1994).  The presence of the broad amendment provision in the Plan leads us to conclude that the Plan's application of the Amendment to Spacek comports with the legally correct interpretation of the Plan.  This is so because the amendment provision undercuts a conclusion that the Plan contains a clear and express intention to guarantee benefits to participants at a level higher than that statutorily required by ERISA.  We reach this conclusion based on the courts' treatment of extra-ERISA obligations in the context of welfare benefit plans.  We first provide an overview of the case law addressing extra-ERISA obligations in welfare benefit plans and then address the propriety of applying the analysis utilized in the welfare benefit cases in the context of pension benefits.

### a. Extra-ERISA obligations in welfare benefit plans

The strong weight of authority throughout the circuits indicates that, in the area of welfare benefits, which are not

21

subject to ERISA's minimum vesting and accrual requirements, Vasseur, 950 F.2d at 1006, a general amendment provision in a welfare benefits plan is of itself sufficient to unambiguously negate any inference that the employer intends for employee welfare benefits to vest contractually, and thus become unalterable, after the employee retires.  See Chiles v. Ceridean Corp., 95 F.3d 1505, 1512 n.2 (10th Cir. 1996) ("We recognize that the weight of case authority supports the . . . approach, that a reservation of rights clause allows the employer to retroactively change the medical benefits of retired participants, even in the face of clear language promising company-paid lifetime benefits." (emphasis added)).

In In re Unisys Corp. Retiree Medical Benefit "ERISA" Litigation, 58 F.3d 896 (3d Cir. 1996), the Third Circuit concluded that the district court did not err in determining that "summary plan descriptions that used the terms 'lifetime' or 'for life' to describe the duration of medical benefits, while at the same time reserving the employer's right to modify or terminate at 'any time' and 'for any reason' the plans under which these benefits were provided, were unambiguous."  Id. at 898-99. Because the provisions were not internally inconsistent, the court concluded that the employer had no contractual obligation to refrain from modifying or terminating the rights of retired employees.  Id. at 904-05.

In Gable v. Sweetheart Cup Co., 35 F.3d 851 (4th Cir. 1994), the Fourth Circuit likewise concluded that a reservation of

22

rights clause in a life and health insurance policy taken out by a company on its employees allowed modification of the rights of retirees covered under the policy.  Id. at 853.  The company distributed forms to retiring employees which stated that the company would "continue [insurance coverage] for you during the remainder of your lifetime at company expense."  Id. at 854.  However, the certificates of insurance issued to employees covered under the policy stated that

> [t]he Policy(ies) under which this certificate is issued may at any time be amended or discontinued by agreement between the Insurance Company and the Policyholder without the consent of or giving of notice to the Insured Person.

Id.

After the insurance policy's inception, the company changed hands and the new owners shifted to a self-insured plan.  Id.  However, the insurance policy in its new form retained the reservation of rights clause.  Id.  The new owners subsequently amended the policy "to reduce benefits, increase deductibles, and require each participant to pay a portion of the insurance premiums."  Id.

The plaintiff retirees, whose rights to insurance were modified by the amendment, brought suit, alleging that their rights under the policy were contractually vested and thus not subject to modification by amendment.  Id. at 855.  The court rejected the retirees' contention that their rights were vested on the ground that the "express reservation of the company's right to modify or terminate the participants' benefits is

23

plainly inconsistent with any alleged intent to vest those benefits." Id. at 856.

Similarly, in Howe v. Varity Corp., 896 F.2d 1107 (8th Cir. 1990), the Eighth Circuit held that an employer unambiguously manifested an intent not to contractually vest retired employees' rights to welfare benefits where the plan contained both a provision stating that welfare benefits "continue in retirement" and a reservation of rights provision. Id. at 1109-10. The reservation of rights provision stated that the employer reserved the right to amend or terminate the plan "at any time," but also provided that the right to amend or terminate "shall not, in any way, affect an Employee's right to claim benefits, diminish, or eliminate any claims for benefits under the provisions of the Plan to which the Employee shall have become entitled prior to the exercise of the [employer's] right . . . to terminate or amend." Id. at 1108. Nevertheless, the court concluded that "the mere fact that employee welfare benefits continue into retirement does not indicate that the benefits become vested for life at the moment of retirement." Id. at 1110; see also Alday v. Container Corp. of Am., 906 F.2d 660, 665 (11th Cir. 1990) (holding that reservation of right to terminate or amend welfare benefits in summary plan description unambiguously manifested intent on the part of employer not to contractually vest welfare benefits). But see Jensen v. SIPCO, Inc., 38 F.3d 945, 950 (8th Cir. 1994) (concluding that plan provisions reserving the right to terminate or modify health benefits were "not facially

24

unambiguous--they leave at least some doubt as to whether SIPCO intended to reserve the right to change or terminate benefits to already retired pensioners, or only the right to make prospective changes for those covered by the Plan but not yet retired").

b. Applicability of the welfare benefits
case law in the pension context

We believe that the contractual analysis in the welfare benefits cases provides the proper framework for our decision in this case. In the same sense that the amendment provisions in Unisys, Gable, and Howe unambiguously established that the welfare benefits at issue in those cases were not contractually guaranteed at a higher level than ERISA requires, the amendment provision of the Plan in this case unambiguously establishes that Spacek's early retirement benefits are not contractually guaranteed at a higher level than ERISA requires. Thus, we conclude that the Plan's application of the Amendment to Spacek comported with the legally correct interpretation of the Plan, and therefore did not constitute an abuse of discretion.

We acknowledge that courts have traditionally applied contract law in a manner that affords pension benefits greater protection than welfare benefits. See, e.g., Danti v. Lewis, 312 F.2d 345, 348-49 (D.C. Cir. 1962) (holding that application of a pension benefit plan amendment to the plaintiff when the amendment was adopted after the plaintiff applied for benefits and rendered the plaintiff ineligible for benefits was arbitrary and capricious). This tendency doubtless stems from the special solicitude that courts have shown in protecting the rights of

25

pensioners, who have labored the greater portion of their lives under an expectation that their hard work would bring them security in retirement.  The statutory framework of ERISA reflects this solicitude toward pensioners' rights through minimum funding, vesting, and accrual requirements for pension plans that are inapplicable to other types of ancillary benefits.  See Wise 986 F.2d at 934-35.  These requirements statutorily preclude a pension plan from "pulling the rug out from under" pensioners.  Williams v. Cordis Corp., 30 F.3d 1429, 1431 (11th Cir. 1994).  Because Congress has chosen to protect pensioners' expectations of retirement security statutorily, the courts need not endeavor--and indeed have no justification for endeavoring-- to safeguard pensioners' interests by liberally applying equity- based theories of contract construction that deviate from contract law's traditional focus on the intent of the parties as determined by the objective manifestations of that intent contained in the language of the parties' agreement.  The cases cited by Spacek support rather than undermine this conclusion.

Spacek relies heavily on the Ninth Circuit's decision in Brug v. Pension Plan of Carpenters Pension Trust Fund, 669 F.2d 570 (9th Cir. 1982).  In that case, the plaintiff became a beneficiary under a pension plan pursuant to an amendment adopted by the trustees of the plan.  Id. at 573.  The plaintiff later became disabled and applied for a disability retirement pension under the plan.  Id.  The trustees of the plan delayed considering the plaintiff's application until after they voted to

26

rescind the amendment that had authorized her qualification as a beneficiary under the plan.  Id.  The trustees then denied the plaintiff's application.  Id.  The court concluded that the trustees' denial of the plaintiff's application was arbitrary and capricious because "the Trustees did not have the discretionary authority to apply that termination [of the amendment allowing the plaintiff to qualify as a plan beneficiary] so as to preclude [her] eligibility for pension benefits that had vested in the meantime."  Id. at 575.

Brug differs from the instant case in that the action of the trustees in Brug completely deprived the plaintiff of any opportunity to obtain benefits by rendering her ineligible to participate in the employee benefit plan.  It is possible that 29 U.S.C. § 1054(g), amended since the Brug decision, would preclude the trustees' rescission of the amendment because such action arguably constitutes an amendment eliminating early retirement benefits.[11]  Had Brug been decided today, deviation from

---

[11]  In Williams v. Plumbers & Steamfitters Local 60 Pension Plan, 48 F.3d 923 (5th Cir. 1995), we were presented with the issue of whether a disability benefit can constitute an early retirement benefit within the meaning of § 1054(g).  However, we declined to address the issue because the appellant had not presented the argument to the district court.  Id. at 925.  We likewise decline to decide the issue here because the parties have not briefed the issue and its resolution is unnecessary to our decision.  Suffice it to say, if the disability retirement pension benefit at issue in Brug constituted an early retirement benefit subject to the protections of § 1054(g), then Brug supports our position that resort to equity-based theories of contract construction is unnecessary to protect pension benefits in light of the enhanced statutory protection of these types of benefits afforded by ERISA.  If the benefit at issue in Brug merely constituted a welfare benefit, then Brug is inconsistent with Unisys, Gable, and Howe, all of which held that a

traditional principles of contract interpretation may well have been unnecessary to protect the interests of the plaintiff in light of the enhanced statutory protections afforded by ERISA.

Spacek next relies upon <u>Pratt v. Petroleum Production Management, Inc. Employee Savings Plan & Trust</u>, 920 F.2d 651 (10th Cir. 1990), in which the Tenth Circuit concluded that the administrators of an executive deferred compensation, or "top hat," plan could not amend the plan so as to change the valuation dates for a terminated employee's shares of the employer's securities held by the plan, and <u>Kemmerer v. ICI Americas Inc.</u>, 70 F.3d 281 (3d Cir. 1995), <u>cert denied</u>, 116 S. Ct. 1826 (1996), in which the Third Circuit utilized similar contractual analysis to conclude that an employer could not terminate a top hat plan and thereby defeat the rights of retired employees. In each case, the court reasoned that "[a] pension plan is a unilateral contract which creates a vested right in those employees who accept the offer it contains by continuing in employment for the requisite number of years," and that unilateral adoption of an amendment cannot operate to diminish rights vested after acceptance of the offer. <u>Pratt</u>, 920 F.2d at 661 (internal quotation marks omitted); <u>see</u> <u>also</u> <u>Kemmerer</u>, 70 F.3d at 287.

<u>Kemmerer</u> and <u>Pratt</u> are distinguishable from the instant case because they involved top hat plans, which are not subject to

---

reservation of rights provision in a welfare benefits plan unambiguously indicated that the plan did not contractually vest plan participants' rights to benefits, and we decline to follow it.

ERISA's full panoply of regulations. "ERISA exempts top-hat plans from the fiduciary, funding, participation and vesting requirements applicable to other employee benefit plans." Duggan v. Hobbs, 99 F.3d 307, 310 (9th Cir. 1996); see also 29 U.S.C. § 1101(a)(1) (exempting top hat plans from fiduciary responsibilities), § 1051(2) (exempting top hat plans from participation and vesting requirements), § 1081(a)(3) (exempting top hat plans from minimum funding standards). As such, top hat plans are in some degree analogous to pre-ERISA pension plans because no statutory mechanism exists to safeguard the expectations of top hat plan participants in obtaining their deferred compensation.[12] It is therefore at least arguable that courts have an equity-based justification for deviating to some degree from traditional contract analysis in evaluating the

---

[12] The analogy is, of course, incomplete because top hat plan participants, unlike ordinary pension plan participants, are typically high-ranking management personnel. Top hat plan participants are therefore better equipped than ordinary pension plan participants to effectively protect their interests in the employee benefits bargaining process. See Duggan, 99 F.3d at 310. This is the very reason that Congress chose not to subject top hat plans to ERISA's vesting, accrual, participation, and fiduciary requirements. As the Department of Labor has observed:

> [I]n providing relief for "top hat" plans from the broad remedial provisions of ERISA, Congress recognized that certain individuals, by virtue of their positions or compensation level, have the ability to affect or substantially influence, through negotiation or otherwise, the design and operation of their deferred compensation plan, taking into consideration any risks attendant thereto, and therefore, would not need the substantive rights and protection of Title I [of ERISA].

Dep't of Labor Op. Ltr. 90-14A.

contractual authority of plan administrators to amend top hat plans that is similar to the equity-based justification for the pro-pensioner contract analysis that appears to underlie pre-ERISA cases interpreting pension plans.

This is precisely the rationale used by the Third Circuit in In re New Valley Corp., 89 F.3d 143 (3d Cir. 1996), cert. denied, 117 S. Ct. 947 (1997), in which the court concluded that a broad amendment and termination provision in a top hat plan did not unambiguously reserve to the employer the right to terminate the plan after its beneficiaries retired. Id. at 152. In doing so, the court distinguished its earlier decision in Unisys, 58 F.3d 896, which held that a substantially similar amendment provision in a welfare benefits plan unambiguously authorized amendments of welfare benefits at any time before or after retirement. See New Valley, 89 F.3d at 153-54.

First, the court concluded that it was not as strictly bound to the language of the plan documents in New Valley as it was in Unisys because top hat plans, unlike welfare benefit plans, are exempt from ERISA's writing requirements. Id. at 153. As such, top hat plan beneficiaries may be more justified in relying upon oral representations that are inconsistent with plan documents. See id. Second, the court observed that top hat plan participants lack the statutory cause of action for breach of fiduciary duty afforded to welfare benefit plan recipients. See id. The court was less inclined to find that the employer had unambiguously reserved the right to terminate the plan at any

30

time when the participants' remedy was limited to a breach of contract action than when the participants had a statutory fall-back cause of action for breach of fiduciary duty.  See id.  Both of these bases for distinguishing top hat plans from welfare benefit plans are equally applicable in distinguishing top hat plans from ordinary pension benefit plans such as the one at issue in this case.  Unlike the top hat plan at issue in New Valley, the Plan is not exempt from ERISA's fiduciary responsibility or writing requirements.  See 29 U.S.C. § 1101(a) (establishing the scope of ERISA's fiduciary responsibility requirements, including the writing requirement contained in § 1102).[13]

An additional justification that courts have offered for

----

[13]  In New Valley, the Third Circuit also based its decision to treat the amendment provision in the top hat plan differently from a similar provision in a welfare benefits plan on the fact that the benefits under the top hat plan were "not payable, at all, until after retirement," whereas the welfare benefits at issue in Unisys "were payable as compensation while the employees worked and then continued on into retirement."  New Valley, 89 F.3d at 154.  The court concluded that the fact that the top hat plan benefits were not payable until after retirement arguably provided some indication that the deferred compensation benefits provided under the plan were intended to become unalterable upon retirement.  We find this argument unpersuasive.  The mere fact that the early retirement benefits at issue under the Plan are not payable until after retirement does not establish the "clear and express" manifestation of an intent to contractually vest those rights upon a plan participant's retirement that is required for contractual vesting of rights under the law of this circuit.  See Wise, 986 F.2d at 937.  "No inference of an intent to vest can be presumed from the fact the benefits are retirement benefits."  Howe, 896 F.2d at 1110.  We thus conclude that New Valley provides no basis for us to depart from the analysis of the welfare benefit cases discussed above in construing the amendment provision's effect on the Plan in this case and thereby determining the propriety of the Plan's application of the Amendment to Spacek.

construing amendment provisions in top hat plans narrowly is that a broad construction of such provisions "'would make the [plans'] several specific and mandatory provisions ineffective, rendering the promises embodied therein completely illusory.'" <u>Kemmerer</u>, 70 F.3d at 287-88 (quoting <u>Carr v. First Nationwide Bank</u>, 816 F. Supp. 1476, 1494 (N.D. Cal. 1993)). A promise is illusory when it creates no obligation whatsoever on the part of the purported promisor. <u>See</u> RESTATEMENT (SECOND) OF CONTRACTS § 2 cmt. e (1981). For example, when one contracting party reserves a right to cancel a services contract at any time without providing notice, the promise will likely be considered illusory. <u>See</u> ARTHUR LINTON CORBIN, CORBIN ON CONTRACTS § 163 (1963). However, if a party reserves the right to terminate upon a certain period of notice to the other party, the reserving party's promise is not rendered illusory because "[t]he party in whom the power has been reserved has made a real promise, one that in terms purports to control his action during the specified period of notice." <u>Id.</u> § 164.

Interpreting a broad amendment provision in a top hat plan to allow an employer to terminate a top hat plan or sharply diminish the benefits that it provides renders the employer's obligations under the plan illusory because, under such a construction of the amendment provision, the employer has no duty of performance under the plan. This is not the case with an ordinary pension plan subject to all of ERISA's statutory safeguards because the backdrop of ERISA guarantees that the employer will have some obligation of performance under the

pension plan.

While employers are not required to offer pension benefits at all, when they choose to do so, they must comply with ERISA's statutory requirements, such as minimum vesting and accrual standards. See Shaw v. Delta Airlines, Inc., 463 U.S. 85, 91 (1983) ("[ERISA] imposes participation, funding, and vesting requirements on pension plans. It also sets various uniform standards, including rules concerning reporting, disclosure, and fiduciary responsibility, for both pension and welfare plans. ERISA does not mandate that employers provide any particular benefits . . . ." (citations omitted)); PERRITT, supra § 3.2 ("ERISA provides for enforcement of employee benefits entitlements only when a contractual right or a trust right to such entitlements exists."). Thus, the administrators of a pension plan governed by ERISA could not, for example, exercise their amendment power so as to eliminate or reduce early retirement benefits because this is statutorily prohibited. See 29 U.S.C. § 1054(g). We therefore conclude that construing a broad amendment provision in a pension plan governed by ERISA as allowing the plan administrators to adopt any amendment that comports with ERISA's statutory requirements does not render the employer's obligations under the plan illusory because the plan administrators are bound to exercise their amendment power in a manner that comports with ERISA's minimum statutory requirements. These statutory requirements guarantee that the employer's performance is not purely discretionary.

In sum, while we express no opinion as to whether the contractual analysis of top hat plans utilized by the courts in Pratt, Kemmerer, and New Valley is correct, we conclude that the justifications for departure from traditional contract interpretation arguably present in dealing with top hat plans are absent in this case because of the statutory safeguards afforded by ERISA to ordinary pension plans such as the one at issue here. These safeguards insure that, when courts give a broad amendment provision in a pension plan the meaning dictated by its plain language, pensioners like Spacek will not have the rug pulled out from under them regarding their pension benefits. Therefore, the Plan's application of the Amendment to Spacek comports with the legally correct interpretation of the Plan.

#### 4. Contra proferentem

Even if we assume that the amendment clause renders the Plan's terms ambiguous and that we must construe the Plan's terms against it in determining the legally correct interpretation under the doctrine of contra proferentem, we are still compelled to conclude that application of the Amendment to Spacek did not constitute an abuse of discretion.[14]  If we assume that the Plan

---

[14]  This court has on several occasions held that the doctrine of contra proferentem applies in construing ERISA plans. See, e.g., Todd v. AIG Life Ins. Co., 47 F.3d 1448, 1451-52 (5th Cir. 1995).  However, we have done so only in construing insurance policies governed by ERISA.  See id.; Ramsey v. Colonial Life Ins. Co. of Am., 12 F.3d 472, 479 (5th Cir. 1994); Hansen v. Continental Ins. Co., 940 F.2d 971, 982 (5th Cir. 1991).  We need not resolve the issue of whether contra proferentem applies outside the insurance context because we conclude that, even if the doctrine applies and we construe the language of the Plan in favor of Spacek, the Plan's application

34

can be reasonably interpreted as authorizing application of

amendments only to participants who have not retired at the time

of the Amendment to Spacek still did not constitute an abuse of
discretion.

We acknowledge that a number of other circuits have
concluded that the doctrine of contra proferentem cannot
logically coexist with the abuse of discretion standard of review
applicable to ERISA plans under which plan administrators are
granted discretion in construing plan provisions. See, e.g.,
Cagle v. Bruner, 112 F.3d 1510, 1519 (11th Cir. 1997) ("[T]he
arbitrary and capricious standard of review would have little
meaning if ambiguous language in an ERISA plan were construed
against the Fund."); Pagan v. NYNEX Pension Plan, 52 F.3d 438,
443 (2d Cir. 1995) ("[A]pplication of the rule of contra
proferentem is limited to those occasions in which this Court
reviews an ERISA plan de novo."). These courts apparently base
their holdings on the view that, if the plan is ambiguous, i.e.,
subject to more than one reasonable interpretation, and the
administrators adopt one reasonable interpretation, the
administrators cannot be said to have acted arbitrarily and
capriciously.

The two-tier abuse of discretion standard that we have
adopted dictates a different approach than that utilized by the
courts mentioned above. While we do not decide whether the rule
of contra proferentem actually applies, we acknowledge that it is
possible for the rule to be used in determining the legally
correct meaning of an ambiguous ERISA plan, the first step of our
abuse of discretion review. See Wildbur, 974 F.2d at 637. If
the administrators did not adopt the interpretation of the plan
dictated by whatever rule of decision we apply--in the case of
contra proferentem, this would be the reasonable interpretation
most favorable to the plan participants, see RESTATEMENT (SECOND) OF
CONTRACTS § 206 (1981)--then we proceed to the second portion of
our analysis in order to determine whether the legally incorrect
interpretation adopted by the administrators constituted an abuse
of discretion. See Wildbur, 974 F.2d at 637. The fact that plan
administrators have adopted one reasonable interpretation of the
plan does not foreclose our proceeding to the second step of our
review for abuse of discretion. "'[A] wrong but apparently
reasonable interpretation is arbitrary and capricious if it
advances the conflicting interest of the fiduciary at the expense
of the affected beneficiary or beneficiaries unless the fiduciary
justifies the interpretation on the ground of its benefit to the
class of all participants and beneficiaries.'" Id. at 638
(quoting Brown v. Blue Cross & Blue Shield of Ala., Inc., 898
F.2d 1556, 1566-67 (11th Cir. 1990).

35

of the amendment's adoption, then, because the Plan applied the Amendment to Spacek after he retired, the rule of <u>contra proferentem</u> would indicate that the Plan did not adopt the legally correct interpretation of its terms.  <u>See</u> RESTATEMENT (SECOND) OF CONTRACTS § 206 (1981) ("In choosing among the reasonable meanings of a promise or agreement or a term thereof, that meaning is generally preferred which operates against the party who supplies the words or from whom a writing otherwise proceeds.").  Therefore, we would proceed to the second step of our review for abuse of discretion in order to determine whether the Plan's legally incorrect interpretation constituted an abuse of discretion.  <u>See</u> <u>Wildbur</u>, 974 F.2d at 637.

Whether an ERISA plan administrator's adoption of a legally incorrect interpretation of an employee benefits plan constitutes an abuse of discretion hinges upon three factors:

   (1)  the internal consistency of the plan under the administrator's interpretation,

   (2)  any relevant regulations formulated by the appropriate administrative agencies, and

   (3)  the factual background of the determination and any inferences of lack of good faith.

<u>Id.</u> at 638; <u>see also</u> <u>Batchelor v. Int'l Bhd. of Elec. Workers Local 861 Pension and Retirement Fund</u>, 877 F.2d 441, 445-48 (5th Cir. 1989).  These factors indicate that the Plan's application of the Amendment to Spacek did not constitute an abuse of discretion.  First, application of the Amendment to Spacek in no way rendered the Plan internally inconsistent.  Second, our research revealed no regulations prohibiting or casting into

36

doubt the propriety of the Plan's application of the Amendment to Spacek. Indeed, the relevant treasury provisions discussed in Part III.A.3, supra, indicate that application of the Amendment to Spacek was perfectly lawful under ERISA. Third, Spacek presented no evidence to the district court that in any way establishes bad faith on the part of the Plan in applying the Amendment to suspend his benefits. The only factual inference that we can draw from the record before us is that the Plan made a good faith decision to conserve its resources for participants who had truly decided to retire and not reenter the local longshoring industry. The affidavit of Shirley H. Hunt, administrator of the Plan at all times relevant to this lawsuit, states that the Plan adopted the Amendment "to promote the Plan's financial integrity and enhance the corpus of the trust assets . . . [by] prevent[ing] early retirees such as Mr. Spacek from returning to work in the longshoring industry while simultaneously collecting regular pension benefits without the necessity of having to make further contributions to the Plan." We therefore conclude that, even if the scope of the Plan's amendment provision is ambiguous, as a matter of law the Plan did not abuse its discretion in applying the Amendment to Spacek.

## IV. CONCLUSION

For the foregoing reasons, we REVERSE the district court's grant of summary judgment in favor and Spacek and REMAND for entry of judgment in favor of the Maritime Association - I.L.A. Pension Plan and the Trustees of the Agreement of Trust.

37